UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| EILEEN LANAHAN, ) | |
| ) | |
| Plaintiff, ) | 2:06-cv-01176-LRH-LRL |
| ) | |
| v. ) | |
| ) | ORDER |
| SOUTHERN NEVADA HEALTH ) | |
| DISTRICT, ) | |
| ) | |
| Defendant. ) | |

Plaintiff Eileen Lanahan alleges Defendant Southern Nevada Health District ("the District") violated Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act ("ADEA") by terminating her because of her gender and age. The District has moved for summary judgment on the basis that Lanahan has not shown the District harbored any discriminatory animus in its decision to terminate her. Because Lanahan has presented evidence that the District relied in part on a discriminatory supervisor in its termination decision, Lanahan has demonstrated there is a genuine issue for trial.

**I.    Facts and Procedural History**

Lanahan was employed by the District from 1988 until she was terminated in July 2005. Jerry Boyd, the District's Facilities Services Manager, became Lanahan's supervisor in 2001. From 2004 to 2005, Lanahan was the subject of several disciplinary actions.

In January 2004, Boyd issued Lanahan a memorandum notifying her that she needed to

improve several areas of her work performance, including following through with assignments and attendance.

In July 2004, Boyd informed Lanahan that she would receive a three-day suspension for tardiness, falsification of time records, dishonesty, and failure to comply with the District's procedures. Angus MacEachern, an appeals officer, reduced Lanahan's suspension to one day.

In September 2004, Boyd issued Lanahan a written reprimand for failing to follow proper reporting procedures.

In February 2005, Karl Munninger, Director of Administrative Services, notified Lanahan that she would be suspended for five days for failing to deliver "claims registers." Munninger told Lanahan that any further disciplinary action would result in termination:

> You have previously been disciplined because of unacceptable work performance and warned that any such behavior would result in discipline or discharge. . . . Should there be cause for any subsequent disciplinary actions in the future, you will be terminated. This is your last chance to conform and work within the rules, regulations, policies, or directives of the Health District.

MacEachern sustained the suspension and noted that

> the failure to perform assigned work directly relates to past problems you have had, such as failure to follow work procedures and practices. Progressive discipline is warranted as there is a direct relationship with performance problems you have had in the past such as failure to follow work procedures and practices.

MacEachern also noted that Munninger "indicated that this discipline is a 'last chance' in that any subsequent disciplinary actions will be cause for your termination. While any such termination may be subject to arbitration in accordance with the Labor Agreement your future employment at the [] District is in Jeopardy should another infraction occur."

In June 2005, Boyd gave Lanahan an evaluation listing several areas of job performance as marginal. Boyd called Lanahan into his office to review the evaluation with her. Lanahan testified in her deposition that the following occurred upon her arrival:

[Boyd] said, "You know what would happen if I told–if you got on my bad side, I told

2

you what would happen?" And I said, "Yes, you did." And he said, "And look what's happened." And I said, "I've been in a lot of trouble." And he said, "Well, there's a way you can correct that." And I said, "How is that?" And he said, "You can do the Jennifer Sizemore move." And he got up and he walked over to the door, opened the door, and he said, "I'll let you think about it."

Lanahan later clarified that the "Jennifer Sizemore move" was a reference to sex.

In her declaration, Lanahan also stated that during the period Boyd was her supervisor, he constantly made outrageous comments. For instance, Boyd stated, "Women are good for only one thing and that is sex." He also stated that he wanted to get rid of two older employees because they were "too old to do their jobs well anymore."

In July 2005, a series of events transpired that eventually resulted in Lanahan's termination. Issues as to possible misconduct first arose after a special meeting had to be cancelled because agendas were not posted in accordance with Nevada's open meeting laws. Dr. Donald Kwalick, the District's Chief Health Officer, and MacEachern requested Connie Read, the District's human resources supervisor, to conduct an investigation into the circumstances leading to the meeting's cancellation. Based on her investigation, Read determined that Lanahan failed to deliver the meeting's agendas in time for a proper posting. Read also reviewed Lanahan's personnel file and decided to recommend her termination. Read based her decision in part on Lanahan's last-chance warning. Read conveyed her recommendation to MacEachern and Munninger, who made the final decision to initiate termination proceedings. Boyd was not involved in this decision.

In accordance with MacEachern and Munninger's decision, a hearing was held before MacEachern, who upheld Lanahan's termination based on her failure to properly perform her duties. In a letter to Lanahan, MacEachern wrote, "You have previously been disciplined because of unacceptable performance and warned that any additional such behavior would result in termination." Bonnie Sorenson heard Lanahan's appeal and sustained MacEachern's decision. In a letter informing Lanahan of her decision, Sorenson wrote,

It has been noted that you have a last chance letter in your file. It has been pointed out

> to you through progressive discipline that you needed to do a better job of communicating and avoid procrastination. You acknowledge that progressive discipline has been carried out appropriately as stated in your union contract. This action by the Clark County Health District to terminate your employment was action you knew would occur if you failed to perform assigned duties, negligence in the performance of duties and the willful avoidance of work. That action is now being taken.

Lanahan's employment was terminated effective July 28, 2005.

The Service Employees International Union Local 1107 filed a grievance on behalf of Lanahan to protest her discharge. An arbitration hearing was held, and on December 5, 2006, the arbitrator rendered a decision, finding the District had just cause to terminate Lanahan. Of note, the arbitrator held that he was basing his decision in part on Lanahan's previous disciplinary history:

> Based upon the record, the Arbitrator has little choice except to conclude that the reasons [Lanahan] received written warnings and suspensions were the reasons [the District] set forth. Having reached this conclusion, it is the Arbitrator's opinion that the discipline imposed on [Lanahan] was appropriate.

After receiving a right-to-sue letter from the U.S. Equal Employment Opportunity Commission, Lanahan initiated the present proceedings in this court.

**II.     Legal Standard**

**A.  Summary Judgment**

Summary judgment is appropriate only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

1    The moving party bears the burden of informing the court of the basis for its motion, along
2 with evidence showing the absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*,
3 477 U.S. 317, 323 (1986). On those issues for which it bears the burden of proof, the moving
4 party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact
5 could find other than for the moving party." *Calderone v. United States*, 799 F.2d 254, 259 (6th
6 Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).
7    In order to successfully rebut a motion for summary judgment, the nonmoving party must
8 point to facts supported by the record which demonstrate a genuine issue of material fact. *Reese v.
9 Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000). A "material fact" is a fact "that might
10 affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S.
11 242, 248 (1986). Where reasonable minds could differ on the material facts at issue, summary
12 judgment is not appropriate. *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983). A dispute
13 regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could
14 return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248. The mere existence of
15 a scintilla of evidence in support of the plaintiff's position will be insufficient to establish a
16 genuine dispute; there must be evidence on which the jury could reasonably find for the plaintiff.
17 *See id.* at 252.

18   **B. Sex and Age Discrimination**

19   Under Title VII of the Civil Rights Act, an employer may not "discriminate against any
20 individual with respect to his compensation, terms, conditions, or privileges of employment,
21 because of such individual's . . . sex . . . ." 42 U.S.C. § 2000e-2(a)(1). The Age Discrimination in
22 Employment Act forbids identical discriminatory conduct on account of an individual's age.
23 *Sischo-Nownejad v. Merced Cmty. College Dist.*, 934 F.2d 1104, 1109 (9th Cir. 1991), *superseded
24 on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074. The court will
25 therefore combine its analysis of Lanahan's Title VII and ADEA claims because the burdens of
26

proof and persuasion are the same under both acts. *See Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 888 (9th Cir. 1994).

The allocation of burdens and the order of presentation of proof for Title VII and ADEA claims follow three steps:

> [A] plaintiff must first establish a *prima facie* case of discrimination. If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate nondiscriminatory reason for its employment decision. Then, in order to prevail, the plaintiff must demonstrate that the employer's alleged reason for the adverse employment decision is a pretext for another motive which is discriminatory.

*Id.* at 889.

A prima facie case may be based either on a presumption arising from the factors set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973) or by more direct evidence of discriminatory intent. *Id.* Moreover, "[w]hen a plaintiff does not rely exclusively on the presumption but seeks to establish a prima facie case through the submission of actual evidence, very little such evidence is necessary to raise a genuine issue of fact regarding an employer's motive; any indication of discriminatory motive . . . may suffice to raise a question that can only be resolved by a factfinder." *Schnidrig v. Columbia Mach., Inc.*, 80 F.3d 1406, 1409 (9th Cir. 1996).

**III. Discussion**

The court will first consider the District's contention that Boyd's comments have no evidentiary value because they are merely stray remarks not directed toward Lanahan. In support of its argument, the District cites to three decisions: *Nesbit v. Pepsico, Inc.*, 994 F.2d 703 (9th Cir. 1993); *Merrick v. Farmers Insurance Group*, 892 F.2d 1434 (9th Cir. 1990); and *Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000).

In *Merrick v. Farmers Insurance Group*, the Ninth Circuit found that a decision maker's comment that a successful job candidate was "a bright, intelligent, knowledgeable young man" was a stray remark and insufficient to show age discrimination against an unsuccessful candidate. 892 F.2d at 1438-39. In *Nesbit v. PepsiCo. Inc.*, the Ninth Circuit concluded that the comments

6

"[w]e don't necessary like grey hair" and "[w]e don't want unpromotable fifty-year olds around" did not show age discrimination because they were ambivalent and did not relate to the plaintiffs' termination.  994 F.2d 703 at 705.  Finally, in *Coleman v. Quaker Oats Co.*, the Ninth Circuit held a manager's statement that a company wanted someone "young and promotable" was insufficient to show a discriminatory hiring decision.  232 F.3d at 1284-85.

Although the District plausibly argues that some of Boyd's statements fall within the category of statements rejected in *Merrick*, *Nesbit*, and *Coleman*, the District fails to address other Ninth Circuit precedent that ultimately dooms its argument.  In *Cordova v. State Farm Insurance Companies*, a decision maker stated that a third party was a "dumb Mexican."  124 F.3d 1145, 1146 (9th Cir. 1997).  In finding that the plaintiff had presented enough evidence to survive summary judgment on his Title VII claim, the Ninth Circuit relied in part on the difference between the decision maker's statement and the statements rejected in *Merrick* and *Nesbit*.  *Id.* at 1149.  The court reasoned that the decision maker's epithet was nonambivalent and "an egregious and bigoted insult . . . ."  *Id.*  Furthermore, the court found that the remark could be proof of discrimination despite its reference to a person other than the plaintiff.  *Id.*

In the present case, Boyd's statements that "[w]omen are good for only one thing and that is sex" and two older employees were "too old to do their jobs well anymore" more accurately fall within the category of statements described in *Cordova* than the comments rejected in *Merrick*, *Nesbit*, and *Coleman*.  The court finds nothing ambivalent about Boyd's statements–they both evidence unambiguous animus against a protected class.  Furthermore, the comments are justly classified as "egregious and bigoted" when compared to the comments in *Merrick*, *Nesbit*, and *Coleman*.[1]

---

[1]The court is also not persuaded by the District's argument that Boyd's ageist comment cannot be considered because it is too remote from Lanahan's termination. *See Metoyer v. Chassman*, 504 F.3d 919, 937 (9th Cir. 2007) ("[W]e have held that remarks by [senior management] tend to show bias, even if several years old.").

7

Finally, Defendant does not even attempt to categorize Boyd's alleged sexual proposition as a stray remark. Boyd's offer to "correct" Lanahan's placement on his bad side if she had sex with him is quintessential evidence of discriminatory animus.

The court's conclusion that Boyd's comments are not stray remarks does not end the matter, however. The court must also decide whether Boyd's comments tainted the District's decision to terminate Lanahan. As the District points out, Boyd was not directly involved in the decision to fire Lanahan. Rather, Kwalick and MacEachern assigned Read to investigate the events leading to the special meeting's cancellation. Moreover, it was MacEachern and Munninger who made the final determination to initiate Lanahan's termination, and MacEachern and Sorenson sustained the decision.

However, as Lanahan points out, Boyd's prior disciplinary actions appear to have played a role in Lanahan's five-day suspension, which was deemed a "last chance" before her dismissal. Specifically, in a February 11, 2005, letter informing Lanahan of her suspension, Munninger wrote,

> You have previously been disciplined because of unacceptable work performance and warned that any additional such behavior would result in discipline or termination. . . . Should there be cause for any subsequent disciplinary actions in the future, you will be terminated. This is your last chance to conform and work within the rules, regulations, policies, or directives of the [] District.

Although Munninger does not identify the prior incidents of "unacceptable work performance," one could reasonably infer that Munninger was referring to (1) Boyd's January 2004 memorandum, notifying Lanahan that she needed to improve several areas of her work performance; (2) Lanahan's July 2004 suspension, which was initiated by Boyd; and (3) Boyd's September 2004 reprimand of Lanahan. Read later based her recommendation to dismiss Lanahan upon the last-chance warning. Moreover, in their decision to terminate Lanahan, both MacEachern and Sorenson relied on the fact that she had previously been disciplined and warned that further discipline would result in termination. Thus, given that Boyd's disciplinary action influenced the

last-chance warning, it appears Boyd had some bearing on the District's decision to terminate Lanahan.

The District, however, argues that any influence Boyd had on the decision to terminate Lanahan is attenuated to such an extent that her evidence is insufficient as a matter of law. The court disagrees.

In *Price Waterhouse v. Hopkins*, the U.S. Supreme Court considered a Title VII sex discrimination claim by a plaintiff who was unlawfully denied a promotion to partner because of a discriminatory vetting process. 490 U.S. 228 (1989), *superseded on other grounds*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1074. The vetting process was structured as follows. First, a candidate's name was submitted by partners in the candidate's office. *Id.* at 232. All of the company's partners were invited to submit comments on the candidate. *Id.* After reviewing the comments and interviewing the partners who submitted them, the company's admissions committee made a recommendation to the company's Policy Board. *Id.* The admissions committee would recommend that the company either accept the candidate for partnership, put her candidacy on hold, or deny the promotion. *Id.* The Policy Board would then decide whether to submit the candidate's name to the entire partnership for a vote, put her candidacy on hold, or reject her. *Id.*

In the plaintiff's case, some the company's partners submitted sexist comments, including one partner who described her as "macho" and another who suggested that she "overcompensated for being a woman." *Id.* at 235. Moreover, another partner told the plaintiff that in order to improve her chances for partnership, she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry." *Id.* The Policy Board put her candidacy on hold until the following year. *See id.* at 232, 257. However, before the time for reconsideration, two of the partners in the plaintiff's office withdrew their support, and she was informed she would not be considered again for partnership. *Id.* at 233 n.1.

After a bench trial, a district court concluded that the company discriminated against the plaintiff by allowing gender stereotyping to play a part in the company's vetting process. *Id.* at 236-37. On appeal, the company challenged this conclusion as clearly erroneous. *Id.* at 255. The Supreme Court rejected the company's contention, finding that the Policy Board violated Title VII when it took into account the partners' sexist comments before putting the plaintiff's candidacy on hold. *Id.* at 256.

This court finds that the present case is indistinguishable from *Price Waterhouse*. Like the Policy Board, the decision makers here, while unbiased themselves, took into account factors allegedly tainted by sexism in making an adverse employment decision. The court, of course, recognizes that the incident leading to Lanahan's termination was investigated and acted upon by unbiased decision makers. However, the court cannot ignore evidence that the decision makers also implicitly relied on Boyd's disciplinary actions in deciding to terminate Lanahan.[2]

In sum, Lanahan has presented a prima facie case of age and sex discrimination through evidence demonstrating that a discriminatory supervisor influenced her termination. Although the District has offered a legitimate, nondiscriminatory reason for its termination decision, Boyd's comments are nevertheless sufficient to create a genuine issue as to whether it was motivated by unlawful discrimination.

Finally, the court will address the District's argument that this court should defer to the arbitrator's decision in considering whether Lanahan can survive summary judgment. The District's argument has its genesis in the U.S. Supreme Court's decision *Alexander v. Gardner-Denver Co.*, where the Court held that an employee is not foreclosed from obtaining a judicial

---

[2]*See also Dominguez-Curry v. Nev. Transp. Dep't*, 424 F.3d 1027, 1039-40 (9th Cir. 2005) ("Where . . . the person who exhibited discriminatory animus influenced or participated in the decisionmaking process, a reasonable factfinder could conclude that the animus affected the employment decision."); *Galdamez v. Potter*, 415 F.3d 1015, 1026 n.9 (9th Cir. 2005) (citing *Price Waterhouse* for the proposition that "Title VII may . . . be violated where the ultimate decision-maker, lacking individual discriminatory intent, takes an adverse employment action in reliance on factors affected by another decision-maker's discriminatory animus").

remedy under Title VII even when his claim of discrimination was previously submitted to arbitration under a collective bargaining agreement. 415 U.S. 36, 59-60 (1974). In the final sentence of its opinion, however, the Court also stated that "the arbitral decision may be admitted as evidence and accorded such weight as the court deems appropriate." *Id.* at 60.

In *Collins v. New York City Transit*, 305 F.3d 113 (2d Cir. 2002), the Second Circuit extended *Alexander*'s final sentence in a case involving a plaintiff who claimed his termination was motivated by his race. Before filing suit in federal court, the plaintiff grieved his discharge to an arbitrator, who found the plaintiff's termination was justified because he had assaulted his supervisor. *Id.* at 117, 118. On appeal, the Second Circuit affirmed a grant of summary judgment for the plaintiff's employer, reasoning that "[w]hile [the plaintiff] may have proffered (barely) enough evidence to create an issue of fact over whether [his supervisor] faked the assault for discriminatory or retaliatory purposes, that proffer is not sufficient to overcome the additional probative weight of the arbitration award allowing his termination." The court continued,

> [A] decision by an independent tribunal that is not itself subject to a claim of bias will attenuate a plaintiff's proof of the requisite causal link. Where, as here, that decision follows an evidentiary hearing and is based on substantial evidence, the Title VII plaintiff, to survive a motion for summary judgment, must present strong evidence that the decision was wrong as a matter of fact–e.g. new evidence not before the tribunal–or that the impartiality of the proceeding was somehow compromised.

*Id.* at 119.

While the *Collins* court may have been correct in finding that the arbitration award was persuasive evidence that the plaintiff was not fired because of his race, this court believes the Second Circuit unjustifiably departed from the Supreme Court's holding in *Alexander*. In *Alexander*, the Supreme Court explicitly held that an arbitration award should not be given preclusive or presumptive effect when considering a plaintiff's claim under Title VII. *Alexander*, 415 U.S. at 49, 58. Given this authority, the court cannot square the Second Circuit's holding that a plaintiff "must present strong evidence that the decision was wrong as a matter of fact–e.g. new

11

evidence not before the tribunal–or that the impartiality of the proceeding was somehow compromised" if the plaintiff is to survive summary judgment. This court will therefore not follow *Collins* as persuasive authority.

**IV.   Conclusion**

Lanahan has succeeded in demonstrating a genuine issue for trial in support of her claims that the District terminated her because of her gender and age. The court also notes that Lanahan does not oppose the District's motion for summary judgment as to her harassment and retaliation claims; therefore, partial summary judgment is granted with respect to those claims.

IT IS THEREFORE ORDERED that Defendant Southern Nevada Health District's Motion for Summary Judgment (#28) is GRANTED in part and DENIED in part.

IT IS FURTHER ORDERED that the parties shall lodge their proposed joint pretrial order within thirty (30) days from entry of this Order. *See* Local Rules 16-4 and 26-1(e)(5).

IT IS SO ORDERED.

DATED this 17th day of February, 2009.

_____
LARRY R. HICKS
UNITED STATES DISTRICT JUDGE